Justice Alito, with whom The Chief Justice, Justice Scalia, and Justice Thomas
join, dissenting.
The Court today holds that the Eighth Amendment categorically prohibits the imposition of the death penalty for the crime of raping a child. This is so, according to the Court, no matter how young the child, no matter how many times the child is raped, no matter how many children the perpetrator rapes, no matter how sadistic the crime, no matter how much physical or psychological trauma is inflicted, and no matter how heinous the perpetrator’s prior criminal record may be. The Court provides two reasons for this sweeping conclusion: First, the Court claims to have identified “a national consensus” that the death penalty is never acceptable for the rape of a child; second, the Court concludes, based on its “independent judgment,” that imposing the death penalty for child rape is inconsistent with “'the evolving standards of decency that mark the progress of a maturing society.’” Ante, at 419, 426, 427. Because neither of these justifications is sound, I respectfully dissent.
*448 I
A
I turn first to the Court’s claim that there is “a national consensus” that it is never acceptable to impose the death penalty for the rape of a child. The Eighth Amendment’s requirements, the Court writes, are “determined not by the standards that prevailed” when the Amendment was adopted but “by the norms that ‘currently prevail.’” Ante, at 419 (quoting Atkins v. Virginia, 536 U. S. 304, 311 (2002)). In assessing current norms, the Court relies primarily on the fact that only 6 of the 50 States now have statutes that permit the death penalty for this offense. But this statistic is a highly unreliable indicator of the views of state lawmakers and their constituents. As I will explain, dicta in this Court’s decision in Coker v. Georgia, 433 U. S. 584 (1977), has stunted legislative consideration of the question whether the death penalty for the targeted offense of raping a young child is consistent with prevailing standards of decency. The Coker dicta gave state legislators and others good reason to fear that any law permitting the imposition of the death penalty for this crime would meet precisely the fate that has now befallen the Louisiana statute that is currently before us, and this threat strongly discouraged state legislators— regardless of their own values and those of their constituents — from supporting the enactment of such legislation.
As the Court correctly concludes, the holding in Coker was that the Eighth Amendment prohibits the death penalty for the rape of an “‘adult woman,’” and thus Coker does not control our decision here. See ante, at 428. But the reasoning of the Justices in the majority had broader implications.
Two Members of the Coker majority, Justices Brennan and Marshall, took the position that the death penalty is always unconstitutional. 433 U. S., at 600 (Brennan, J., concurring in judgment), and ibid. (Marshall, J., concurring in judg *449 ment). Four other Justices, who joined the controlling plurality opinion, suggested that the Georgia capital rape statute was unconstitutional for the simple reason that the impact of a rape, no matter how heinous, is not grievous enough to justify capital punishment. In the words of the plurality: “Life is over for the victim of the murderer; for the rape victim, life may not be nearly so happy as it was, but it is not over and normally is not beyond repair.” Id., at 598. The plurality summarized its position as follows: “We have the abiding conviction that the death penalty . . . is an excessive penalty for the rapist who, as such, does not take human life.” Ibid.
The implications of the Coker plurality opinion were plain. Justice Powell, who concurred in the judgment overturning the death sentence in the case at hand, did not join the plurality opinion because he understood it to draw “a bright line between murder and all rapes — regardless of the degree of brutality of the rape or the effect upon the victim.” Id., at 603. If Justice Powell read Coker that way, it was reasonable for state legislatures to do the same.
Understandably, state courts have frequently read Coker in precisely this way. The Court is correct that state courts have generally understood the limited scope of the holding in Coker, ante, at 429-430, but lower courts and legislators also take into account—and I presume that this Court wishes them to continue to take into account—the Court’s dicta. And that is just what happened in the wake of Coker. Four years after Coker, when Florida’s capital child-rape statute was challenged, the Florida Supreme Court, while correctly noting that this Court had not held that the Eighth Amendment bars the death penalty for child rape, concluded that “[t]he reasoning of the justices in Coker v. Georgia compels us to hold that a sentence of death is grossly disproportionate and excessive punishment for the crime of sexual assault and is therefore forbidden by the Eighth Amendment as cruel *450 and unusual punishment.” Buford v. State, 403 So. 2d 943, 951 (1981).
Numerous other state courts have interpreted the Coker dicta similarly. See State v. Barnum, 921 So. 2d 513, 526 (Fla. 2005) (citing Coker as holding that “ ‘a sentence of death is grossly disproportionate and excessive punishment for the crime of rape,’” not merely the rape of an adult woman); People v. Huddleston, 212 Ill. 2d 107, 141, 816 N. E. 2d 322, 341 (2004) (recognizing that “the constitutionality of state statutes that impose the death penalty for nonhomicide crimes is the subject of debate” after Coker); People v. Hernandez, 30 Cal. 4th 835, 867, 69 P. 3d 446, 464-467 (2003) (Coker “rais[ed] serious doubts that the federal Constitution permitted the death penalty for any offense not requiring the actual taking of human life” because “[although the high court did not expressly hold [in Coker] that the Eighth Amendment prohibits capital punishment for all crimes not resulting in death, the plurality stressed that the crucial difference between rape and murder is that a rapist ‘does not take human life’ ”); State v. Gardner, 947 P. 2d 630, 653 (Utah 1997) (“The Coker holding leaves no room for the conclusion that any rape, even an ‘inhuman’ one involving torture and aggravated battery but not resulting in death, would constitutionally sustain imposition of the death penalty”); Parker v. State, 216 Ga. App. 649, n. 1, 455 S. E. 2d 360, 361, n. 1 (1995) (citing Coker for the proposition that the death penalty “is no longer permitted for rape where the victim is not killed”); Leatherwood v. State, 548 So. 2d 389, 406 (Miss. 1989) (Robertson, J., concurring) (“There is as much chance of the Supreme Court sanctioning death as a penalty for any non-fatal rape as the proverbial snowball enjoys in the nether regions”); State v. Coleman, 185 Mont. 299, 327-328, 605 P. 2d 1000, 1017 (1979) (stating that “[t]he decision of the Court in Coker v. Georgia is relevant only to crimes for which the penalty has been imposed which did not result in *451 the loss of a life” (citations omitted)); Boyer v. State, 240 Ga. 170, 240 S. E. 2d 68 (1977) (per curiam) (stating that “[s]ince death to the victim did not result . . . the death penalty for rape must be set aside”); see also 05-1981 (La. 5/22/07), 957 So. 2d 757, 794 (case below) (Calogero, C. J., dissenting) (citing the comments of the Coker plurality and concluding that the Louisiana child-rape law cannot pass constitutional muster).[1]
For the past three decades, these interpretations have posed a very high hurdle for state legislatures considering the passage of new laws permitting the death penalty for the rape of a child. The enactment and implementation of any *452 new state death penalty statute — and particularly a new type of statute such as one that specifically targets the rape of young children — imposes many costs. There is the burden of drafting an innovative law that must take into account this Court’s exceedingly complex Eighth Amendment jurisprudence. Securing passage of controversial legislation may interfere in a variety of ways with the enactment of other bills on the legislative agenda. Once the statute is enacted, there is the burden of training and coordinating the efforts of those who must implement the new law. Capital prosecutions are qualitatively more difficult than noncapital prosecutions and impose special emotional burdens on all involved. When a capital sentence is imposed under the new law, there is the burden of keeping the prisoner on death row and the lengthy and costly project of defending the constitutionality of the statute on appeal and in collateral proceedings. And if the law is eventually overturned, there is the burden of new proceedings on remand. Moreover, conscientious state lawmakers, whatever their personal views about the morality of imposing the death penalty for child rape, may defer to this Court’s dicta, either because they respect our authority and expertise in interpreting the Constitution or merely because they do not relish the prospect of being held to have violated the Constitution and contravened prevailing “standards of decency.” Accordingly, the Coker dicta gave state legislators a strong incentive not to push for the enactment of new capital child-rape laws even though these legislators and their constituents may have believed that the laws would be appropriate and desirable.
B
The Court expresses doubt that the Coker dicta had this effect, but the skepticism is unwarranted. It would be quite remarkable if state legislators were not influenced by the considerations noted above. And although state legislatures typically do not create legislative materials like those *453 produced by Congress, there is evidence that proposals to permit the imposition of the death penalty for child rape were opposed on the ground that enactment would be futile and costly.
In Oklahoma, the opposition to the State’s capital child-rape statute argued that Coker had already ruled the death penalty unconstitutional as applied to cases of rape. See Oklahoma State Senate News Release, Senator Nichols Targets Child Predators With Death Penalty, Child Abuse Response Team, May 26,2006, online at http://www.oksenate. gov/news/press_releases/press_releases_2006/pr20060526dpv. html (all Internet materials as visited June 23, 2008, and available in Clerk of Court’s case file). Likewise, opponents of South Carolina’s capital child-rape law contended that the statute would waste state resources because it would undoubtedly be held unconstitutional. See The State, Death Penalty Plan in Spotlight: Attorney General To Advise Senate Panel on Proposal for Repeat Child Rapists, Mar. 28, 2006 (quoting Laura Hudson, spokeswoman for the S. C. Victim Assistance Network, as stating that “‘[w]e don’t need to be wasting state money to have an appeal to the [United States] Supreme Court, . . . knowing we are going to lose it’”). Representative Fletcher Smith of the South Carolina House of Representatives forecast that the bill would not meet constitutional standards because “death isn’t involved.” See Davenport, Emotion Drives Child Rape Death Penalty Debate in South Carolina, Associated Press, Apr. 4, 2006.
In Texas, opponents of that State’s capital child-rape law argued that Coker’s reasoning doomed the proposal. House Research Organization Bill Analysis, Mar. 5,2007, p. 10 (stating that “the law would impose an excessive punishment and fail to pass the proportionality test established by the U. S. Supreme Court” and arguing that “Texas should not enact a law of questionable constitutionality simply because it is politically popular, especially given clues by the U. S. Su *454 preme Court that death penalty laws that would be rarely imposed or that are not supported by a broad national consensus would be ruled unconstitutional”).
C
Because of the effect of the Coker dicta, the Court is plainly wrong in comparing the situation here to that in Atkins or Roper v. Simmons, 543 U. S. 551 (2005). See ante, at 425. Atkins concerned the constitutionality of imposing the death penalty on a mentally retarded defendant. Thirteen years earlier, in Penry v. Lynaugh, 492 U. S. 302 (1989), the Court had held that this was permitted by the Eighth Amendment, and therefore, during the time between Penry and Atkins, state legislators had reason to believe that this Court would follow its prior precedent and uphold statutes allowing such punishment.
The situation in Roper was similar. Roper concerned a challenge to the constitutionality of imposing the death penalty on a defendant who had not reached the age of 18 at the time of the crime. Sixteen years earlier, in Stanford v. Kentucky, 492 U. S. 361 (1989), the Court had rejected a similar challenge, and therefore state lawmakers had cause to believe that laws allowing such punishment would be sustained.
When state lawmakers believe that their decision will prevail on the question whether to permit the death penalty for a particular crime or class of offender, the legislators’ resolution of the issue can be interpreted as an expression of their own judgment, informed by whatever weight they attach to the values of their constituents. But when state legislators think that the enactment of a new death penalty law is likely to be futile, inaction cannot reasonably be interpreted as an expression of their understanding of prevailing societal values. In that atmosphere, legislative inaction is more likely to evidence acquiescence.
*455 D
If anything can be inferred from state legislative developments, the message is very different from the one that the Court perceives. In just the past few years, despite the shadow cast by the Coker dicta, five States have enacted targeted capital child-rape laws. See Ga. Code Ann. § 16-6-1 (1999); Mont. Code Ann. § 45-5-503 (1997); Okla. Stat., Tit. 10, § 7115(E) (West Supp. 2008); S. C. Code Ann. § 16-3-655(C)(1) (Supp. 2007); Tex. Penal Code Ann. §§ 22.021(a), 12.42(c)(3) (West Supp. 2007). If, as the Court seems to think, our society is “evolving” toward ever higher “standards of decency,” ante, at 446, these enactments might represent the beginning of a new evolutionary line.
Such a development would not be out of step with changes in our society’s thinking since Coker was decided. During that time, reported instances of child abuse have increased dramatically;[2] and there are many indications of growing alarm about the sexual abuse of children. In 1994, Congress enacted the Jacob Wetter ling Crimes Against Children and Sexually Violent Offender Registration Program, 42 U. S. C. § 14071 (2000 ed. and Supp. V), which requires States receiving certain federal funds to establish registration systems *456 for convicted sex offenders and to notify the public about persons convicted of the sexual abuse of minors. All 50 States have now enacted such statutes.[3] In addition, at *457 least 21 States and the District of Columbia now have statutes permitting the involuntary commitment of sexual predators,[4] and at least 12 States have enacted residency restrictions for sex offenders.[5]
*458 Seeking to counter the significance of the new capital child-rape laws enacted during the past two years, the Court points out that in recent months efforts to enact similar laws in five other States have stalled. Ante, at 431-432. These developments, however, all took place after our decision to grant certiorari in this case, see 552 U. S. 1087 (2008), which gave state legislators reason to delay the enactment of new legislation until the constitutionality of such laws was clarified. And there is no evidence of which I am aware that these legislative initiatives failed because the proposed laws were viewed as inconsistent with our society’s standards of decency.
On the contrary, the available evidence suggests otherwise. For example, in Colorado, the Senate Appropriations Committee in April voted 6 to 4 against Senate Bill 195, reportedly because it “would have cost about $616,000 next year for trials, appeals, public defenders, and prison costs.” Associated Press, Lawmakers Reject Death Penalty for *459 Child Sex Abusers, Denver Post, Apr. 11, 2008. Likewise, in Tennessee, the capital child-rape bill was withdrawn in committee “because of the high associated costs.” The bill’s sponsor stated that “ ‘[b]ecause of the state’s budget situation, we thought to withdraw that bill. . . . We’ll revisit it next year to see if we can reduce the cost of the fiscal note.’ ” Green, Small Victory in Big Fight for Tougher Sex Abuse Laws, The Leaf-Chronicle, May 8, 2008, p. 1A. Thus, the failure to enact capital child-rape laws cannot be viewed as evidence of a moral consensus against such punishment.
E
Aside from its misleading tally of current state laws, the Court points to two additional “objective indicia” of a national “consensus,” ante, at 422, but these arguments are patent makeweights. The Court notes that Congress has not enacted a law permitting a federal district court to impose the death penalty for the rape of a child, ante, at 423, but due to the territorial limits of the relevant federal statutes, very few rape cases, not to mention child-rape cases, are prosecuted in federal court. See 18 U. S. C. §§ 2241, 2242 (2000 ed. and Supp. V); United States Sentencing Commission, Report to Congress: Analysis of Penalties for Federal Rape Cases, p. 10, Table 1. Congress’ failure to enact a death penalty statute for this tiny set of cases is hardly evidence of Congress’ assessment of our society’s values.[6]
Finally, the Court argues that statistics about the number of executions in rape cases support its perception of a “national consensus,” but here too the statistics do not support the Court’s position. The Court notes that the last execution for the rape of a child occurred in 1964, ante, at 433, but the Court fails to mention that litigation regarding the *460 constitutionality of the death penalty brought executions to a halt across the board in the late 1960’s. In 1965 and 1966, there were a total of eight executions for all offenses, and from 1968 until 1977, the year when Coker was decided, there were no executions for any crimes.[7] The Court also fails to mention that in Louisiana, since the state law was amended in 1995 to make child rape a capital offense, prosecutors have asked juries to return death verdicts in four cases. See State v. Dickerson, 01-1287 (La. App. 6/26/02), 822 So. 2d 849; State v. LeBlanc, 00-1322 (La. App. 5/13/01), 788 So. 2d 1255; 957 So. 2d 757; State v. Davis, Case No. 262, 971 (1st Jud. Dist., Caddo Parish, La.) (cited in Brief for Respondent 42, and n. 38). In two of those cases, Louisiana juries imposed the death penalty. See 957 So. 2d 757; Davis, supra. This 50% record is hardly evidence that juries share the Court’s view that the death penalty for the rape of a young child is unacceptable under even the most aggravated circumstances.[8]
F
In light of the points discussed above, I believe that the “objective indicia” of our society’s “evolving standards of decency” can be fairly summarized as follows. Neither Congress nor juries have done anything that can plausibly be interpreted as evidencing the “national consensus” that the Court perceives. State legislatures, for more than 30 years, have operated under the ominous shadow of the Coker dicta and thus have not been free to express their own understanding of our society’s standards of decency. And in the months following our grant of certiorari in this case, state *461 legislatures have had an additional reason to pause. Yet despite the inhibiting legal atmosphere that has prevailed since 1977, six States have recently enacted new, targeted child-rape laws.
I do not suggest that six new state laws necessarily establish a “national consensus” or even that they are sure evidence of an ineluctable trend. In terms of the Court’s metaphor of moral evolution, these enactments might have turned out to be an evolutionary dead end. But they might also have been the beginning of a strong new evolutionary line. We will never know, because the Court today snuffs out the line in its incipient stage.
II
A
The Court is willing to block the potential emergence of a national consensus in favor of permitting the death penalty for child rape because, in the end, what matters is the Court’s “own judgment” regarding “the acceptability of the death penalty.” Ante, at 434 (internal quotation marks omitted). Although the Court has much to say on this issue, most of the Court’s discussion is not pertinent to the Eighth Amendment question at hand. And once all of the Court’s irrelevant arguments are put aside, it is apparent that the Court has provided no coherent explanation for today’s decision.
In the next section of this opinion, I will attempt to weed out the arguments that are not germane to the Eighth Amendment inquiry, and in the final section, I will address what remains.
B
A major theme of the Court’s opinion is that permitting the death penalty in child-rape cases is not in the best interests of the victims of these crimes and society at large. In this vein, the Court suggests that it is more painful for child-rape victims to testify when the prosecution is seeking *462 the death penalty. Ante, at 442-443. The Court also argues that “a State that punishes child rape by death may remove a strong incentive for the rapist not to kill the victim,” ante, at 445, and may discourage the reporting of child rape, ante, at 444-445.
These policy arguments, whatever their merits, are simply not pertinent to the question whether the death penalty is “cruel and unusual” punishment. The Eighth Amendment protects the right of an accused. It does not authorize this Court to strike down federal or state criminal laws on the ground that they are not in the best interests of crime victims or the broader society. The Court’s policy arguments concern matters that legislators should — and presumably do — take into account in deciding whether to enact a capital child-rape statute, but these arguments are irrelevant to the question that is before us in this case. Our cases have cautioned against using “The aegis of the Cruel and Unusual Punishment Clause’ to cut off the normal democratic processes,” Atkins v. Virginia, 536 U. S., at 323 (Rehnquist, C. J., dissenting) (quoting Gregg v. Georgia, 428 U. S. 153, 176 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)), but the Court forgets that warning here.
The Court also contends that laws permitting the death penalty for the rape of a child create serious procedural problems. Specifically, the Court maintains that it is not feasible to channel the exercise of sentencing discretion in child-rape cases, ante, at 439-440, and that the unreliability of the testimony of child victims creates a danger that innocent defendants will be convicted and executed, ante, at 443-444. Neither of these contentions provides a basis for striking down all capital child-rape laws no matter how carefully and narrowly they are crafted.
The Court’s argument regarding the structuring of sentencing discretion is hard to comprehend. The Court finds it “difficult to identify standards that would guide the decisionmaker so the penalty is reserved for the most severe *463 cases of child rape and yet not imposed in an arbitrary way.” Ante, at 439. Even assuming that the age of a child is not alone a sufficient factor for limiting sentencing discretion, the Court need only examine the child-rape laws recently enacted in Texas, Oklahoma, Montana, and South Carolina, all of which use a concrete factor to limit quite drastically the number of cases in which the death penalty may be imposed. In those States, a defendant convicted of the rape of a child may be sentenced to death only if the defendant has a prior conviction for a specified felony sex offense. See Mont. Code Ann. § 45-5-503(3)(c) (2007) (“If the offender was previously convicted of [a felony sexual offense] . . . the offender shall be . .. punished by death . .. ”); Okla. Stat., Tit. 10, § 7115(K) (West Supp. 2008) (“Notwithstanding any other provision of law, any parent or other person convicted of forcible anal or oral sodomy, rape, rape by instrumentation, or lewd molestation of a child under fourteen (14) years of age subsequent to a previous conviction for any offense of forcible anal or oral sodomy, rape, rape by instrumentation, or lewd molestation of a child under fourteen (14) years of age shall be punished by death”); S. C. Code Ann. § 16-3-655(C)(1) (Supp. 2007) (“If the [defendant] has previously been convicted of, pled guilty or nolo contendere to, or adjudicated delinquent for first degree criminal sexual conduct with a minor who is less than eleven years of age ... he must be punished by death or by imprisonment for life”); Tex. Penal Code Ann. § 12.42(c)(3) (West Supp. 2007) (“[A] defendant shall be punished for a capital felony if it is shown on the trial of an offense under Section 22.021... that the defendant has previously been finally convicted of [a felony sexual offense against a victim younger than fourteen years of age]”).
Moreover, it takes little imagination to envision other limiting factors that a State could use to structure sentencing discretion in child-rape cases. Some of these might be: whether the victim was kidnaped, whether the defendant inflicted severe physical injury on the victim, whether the vie *464 tim was raped multiple times, whether the rapes occurred over a specified extended period, and whether there were multiple victims.
The Court refers to limiting standards that are “indefinite and obscure,” ante, at 441, but there is nothing indefinite or obscure about any of the above-listed aggravating factors. Indeed, they are far more definite and clear cut than aggravating factors that we have found to be adequate in murder cases. See, e. g., Arave v. Creech, 507 U. S. 463, 471 (1993) (whether the defendant was a “ ‘cold-blooded, pitiless slayer’ ”); Walton v. Arizona, 497 U. S. 639, 646 (1990) (whether the “‘perpetrator inflict[ed] mental anguish or physical abuse before the victim’s death’”); Jurek v. Texas, 428 U. S. 262, 269 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (whether the defendant “ ‘would commit criminal acts of violence that would constitute a continuing threat to society’ ”). For these reasons, concerns about limiting sentencing discretion provide no support for the Court’s blanket condemnation of all capital child-rape statutes.
That sweeping holding is also not justified by the Court’s concerns about the reliability of the testimony of child victims. First, the Eighth Amendment provides a poor vehicle for addressing problems regarding the admissibility or reliability of evidence, and problems presented by the testimony of child victims are not unique to capital cases. Second, concerns about the reliability of the testimony of child witnesses are not present in every child-rape case. In the case before us, for example, there was undisputed medical evidence that the victim was brutally raped, as well as strong independent evidence that petitioner was the perpetrator. Third, if the Court’s evidentiary concerns have Eighth Amendment relevance, they could be addressed by allowing the death penalty in only those child-rape cases in which the independent evidence is sufficient to prove all the elements needed for conviction and imposition of a death sentence. There is precedent for requiring special corroboration in certain criminal *465 cases. For example, some jurisdictions do not allow a conviction based on the uncorroborated testimony of an accomplice. See, e. g., Ala. Code § 12-21-222 (1986); Alaska Stat. § 12.45.020 (1984); Ark. Code Ann. § 16-89-111 (e)(1) (1977); Cal. Penal Code Ann. § 1111 (West 1985); Ga. Code Ann. § 24-4-8 (1995); Idaho Code § 19-2117 (Lexis 1979); Minn. Stat. § 634.04 (1983); Mont. Code Ann. § 46-16-213 (1985); Nev. Rev. Stat. § 175.291 (1985); N. D. Cent. Code Ann. § 29-21-14 (Lexis 1974); Okla. Stat., Tit. 22, § 742 (West 1969); Ore. Rev. Stat. § 136.440 (1984); S. D. Codified Laws § 23A-22-8 (1979). A State wishing to permit the death penalty in child-rape cases could impose an analogous corroboration requirement.
C
After all the arguments noted above are put aside, what is left? What remaining grounds does the Court provide to justify its independent judgment that the death penalty for child rape is categorically unacceptable? I see two.
1
The first is the proposition that we should be “most hesitant before interpreting the Eighth Amendment to allow the extension of the death penalty.” Ante, at 435 (emphasis added); see also ante, at 437, 441 (referring to expansion of the death penalty). But holding that the Eighth Amendment does not categorically prohibit the death penalty for the rape of a young child would not “extend” or “expand” the death penalty. Laws enacted by the state legislatures are presumptively constitutional, Gregg, 428 U. S., at 175 (joint opinion of Stewart, Powell, and Stevens, JJ.) (“[I]n assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity”), and until today, this Court has not held that capital child-rape laws are unconstitutional, see ante, at 428 (Coker “does not speak to the constitutionality of the death penalty for child rape, an issue not then before the Court”). *466 Consequently, upholding the constitutionality of such a law would not “extend” or “expand” the death penalty; rather, it would confirm the status of presumptive constitutionality that such laws have enjoyed up to this point. And in any event, this Court has previously made it clear that “[t]he Eighth Amendment is not a ratchet, whereby a temporary consensus on leniency for a particular crime fixes a permanent constitutional maximum, disabling the States from giving effect to altered beliefs and responding to changed social conditions.” Harmelin v. Michigan, 501 U. S. 957, 990 (1991) (principal opinion); see also Gregg, supra, at 176 (joint opinion of Stewart, Powell, and Stevens, JJ.).
2
The Court’s final — and, it appears, principal — justification for its holding is that murder, the only crime for which defendants have been executed since this Court’s 1976 death penalty decisions,[9] is unique in its moral depravity and in the severity of the injury that it inflicts on the victim and the public. See ante, at 437-438. But the Court makes little attempt to defend these conclusions.
With respect to the question of moral depravity, is it really true that every person who is convicted of capital murder and sentenced to death is more morally depraved than every child rapist? Consider the following two cases. In the first, a defendant robs a convenience store and watches as his accomplice shoots the store owner. The defendant acts recklessly, but was not the triggerman and did not intend the killing. See, e. g., Tison v. Arizona, 481 U. S. 137 (1987). In the second case, a previously convicted child rapist kidnaps, repeatedly rapes, and tortures multiple child victims. Is it clear that the first defendant is more morally depraved than the second?
*467 The Court’s decision here stands in stark contrast to Atkins and Roper, in which the Court concluded that characteristics of the affected defendants—mental retardation in Atkins and youth in Roper—diminished their culpability. See Atkins, 536 U. S., at 305; Roper, 543 U. S., at 571. Nor is this case comparable to Enmund v. Florida, 458 U. S. 782 (1982), in which the Court held that the Eighth Amendment prohibits the death penalty where the defendant participated in a robbery during which a murder was committed but did not personally intend for lethal force to be used. I have no doubt that, under the prevailing standards of our society, robbery, the crime that the petitioner in Enmund intended to commit, does not evidence the same degree of moral depravity as the brutal rape of a young child. Indeed, I have little doubt that, in the eyes of ordinary Americans, the very worst child rapists — predators who seek out and inflict serious physical and emotional injury on defenseless young children — are the epitome of moral depravity.
With respect to the question of the harm caused by the rape of a child in relation to the harm caused by murder, it is certainly true that the loss of human life represents a unique harm, but that does not explain why other grievous harms are insufficient to permit a death sentence. And the Court does not take the position that no harm other than the loss of life is sufficient. The Court takes pains to limit its holding to “crimes against individual persons” and to exclude “offenses against the State,” a category that the Court stretches — without explanation — to include “drug kingpin activity.” Ante, at 437. But the Court makes no effort to explain why the harm caused by such crimes is necessarily greater than the harm caused by the rape of young children. This is puzzling in light of the Court’s acknowledgment that “[r]ape has a permanent psychological, emotional, and sometimes physical impact on the child.” Ante, at 435. As the Court aptly recognizes, “[w]e cannot dismiss the years of *468 long anguish that must be endured by the victim of child rape.” Ibid.
The rape of any victim inflicts great injury, and “[s]ome victims are so grievously injured physically or psychologically that life is beyond repair.” Coker, 483 U. S., at 603 (opinion of Powell, J.). “The immaturity and vulnerability of a child, both physically and psychologically, adds a devastating dimension to rape that is not present when an adult is raped.” Meister, Murdering Innocence: The Constitutionality of Capital Child Rape Statutes, 45 Ariz. L. Rev. 197, 208-209 (2003). See also State v. Wilson, 96-1392, p. 6 (La. 12/13/96), 685 So. 2d 1063, 1067; Broughton, “On Horror’s Head Horrors Accumulate”: A Reflective Comment on Capital Child Rape Legislation, 39 Duquesne L. Rev. 1, 38 (2000). Long-term studies show that sexual abuse is “grossly intrusive in the lives of children and is harmful to their normal psychological, emotional, and sexual development in ways which no just or humane society can tolerate.” C. Bagley & K. King, Child Sexual Abuse: The Search for Healing 2 (1990).
It has been estimated that as many as 40% of 7- to 13-year-old sexual assault victims are considered “seriously disturbed.” A. Lurigio, M. Jones, & B. Smith, Child Sexual Abuse: Its Causes, Consequences, and Implications for Probation Practice, 59 Fed. Probation 69, 70 (Sept. 1995). Psychological problems include sudden school failure, unprovoked crying, dissociation, depression, insomnia, sleep disturbances, nightmares, feelings of guilt and inferiority, and self-destructive behavior, including an increased incidence of suicide. Meister, supra, at 209; Broughton, supra, at 38; Glazer, Child Rapists Beware! The Death Penalty and Louisiana’s Amended Aggravated Rape Statute, 25 Am. J. Crim. L. 79, 88 (1997).
The deep problems that afflict child-rape victims often become society’s problems as well. Commentators have noted *469 correlations between childhood sexual abuse and later problems such as substance abuse, dangerous sexual behaviors or dysfunction, inability to relate to others on an interpersonal level, and psychiatric illness. Broughton, supra, at 38; Glazer, supra, at 89; Handbook on Sexual Abuse of Children 7 (L. Walker ed. 1988). Victims of child rape are nearly 5 times more likely than nonvictims to be arrested for sex crimes and nearly 30 times more likely to be arrested for prostitution. Ibid.
The harm that is caused to the victims and to society at large by the worst child rapists is grave. It is the judgment of the Louisiana lawmakers and those in an increasing number of other States that these harms justify the death penalty. The Court provides no cogent explanation why this legislative judgment should be overridden. Conclusory references to “decency,” “moderation,” “restraint,” “full progress,” and “moral judgment” are not enough.
Ill
In summary, the Court holds that the Eighth Amendment categorically rules out the death penalty in even the most extreme cases of child rape even though: (1) This holding is not supported by the original meaning of the Eighth Amendment; (2) neither Coker nor any other prior precedent commands this result; (3) there are no reliable “objective indicia” of a “national consensus” in support of the Court’s position; (4) sustaining the constitutionality of the state law before us would not “extend” or “expand” the death penalty; (5) this Court has previously rejected the proposition that the Eighth Amendment is a one-way ratchet that prohibits legislatures from adopting new capital punishment statutes to meet new problems; (6) the worst child rapists exhibit the epitome of moral depravity; and (7) child rape inflicts grievous injury on victims and on society in general.
*470 The party attacking the constitutionality of a state statute bears the “heavy burden” of establishing that the law is unconstitutional. Gregg, 428 U. S., at 175 (joint opinion of Stewart, Powell, and Stevens, JJ.). That burden has not been discharged here, and I would therefore affirm the decision of the Louisiana Supreme Court.

 Commentators have expressed similar views. See Fleming, Louisiana’s Newest Capital Crime: The Death Penalty for Child Rape, 89 J. Crim. L. & C. 717, 727 (1999) (the Coker Court drew a line between “crimes which result in loss of life, and crimes which do not”); Bailey, Death Is Different, Even on the Bayou: The Disproportionality of Crime, 55 Wash. & Lee L. Rev. 1335,1357 (1998) (noting that “[m]any post-Coker cases interpreting the breadth of Coker’s holding suggest that the Mississippi Supreme Court’s narrow reading of Coker in Upshaw is a minority position”); Matura, When Will It Stop? The Use of the Death Penalty for Non-homicide Crimes, 24 J. Legis. 249, 255 (1998) (stating that the Coker Court did not “draw a distinction between the rape of an adult woman and the rape of a minor”); Garvey, “As the Gentle Rain from Heaven”: Mercy in Capital Sentencing, 81 Cornell L. Rev. 989, 1009, n. 74 (1996) (stating that courts generally understand Coker to prohibit death sentences for crimes other than murder); Nanda, Recent Developments in the United States and Internationally Regarding Capital Punishment — An Appraisal, 67 St. John’s L. Rev. 523, 532 (1993) (finding that Coker stands for the proposition that a death sentence is excessive when the victim is not killed); Ellis, Guilty but Mentally Ill and the Death Penalty: Punishment Full of Sound and Fury, Signifying Nothing, 43 Duke L. J. 87, 94 (1994) (referencing Coker to require capital offenses to be defined by unjustified human death); Dingerson, Reclaiming the Gavel: Making Sense Out of the Death Penalty Debate in State Legislatures, 18 N. Y. U. Rev. L. & Soc. Change 873, 878 (1991) (stating that Coker “ruled that the imposition of the death penalty for crimes from which no death results violates the cruel and unusual punishment provision of the eighth amendment” and that “[n]o subsequent Supreme Court decision has challenged this precedent”).

 From 1976 to 1986, the number of reported cases of child sexual abuse grew from 6,000 to 132,000, an increase of 2,100%. A. Lurigio, M. Jones, & B. Smith, Child Sexual Abuse: Its Causes, Consequences, and Implications for Probation Practice, 59 Fed. Probation 69 (Sept. 1995). By 1991, the number of cases totaled 432,000, an increase of another 227%. Ibid. In 1995, local child protection services agencies identified 126,000 children who were victims of either substantiated or indicated sexual abuse. Nearly 30% of those child victims were between the ages of four and seven. Rape, Abuse & Incest National Network Statistics, online at http://www.rainn.org/get-information/statistics/sexual-assault-victims. There were an estimated 90,000 substantiated cases of child sexual abuse in 2003. Crimes Against Children Research Center, Reports From the States to the National Child Abuse and Neglect Data System, available at http://www.unh.edu/ccrc/sexual-abuse/Child%20Sexual%20Abuse.pdf.

 Ala. Code §§ 13A-11-200 to 13A-11-202, 13A-11-1181 (2006); Alaska Stat. §§ 11.56.840, 12.63.010 to 12.63.100, 18.65.087, 28.05.048, 33.30.035 (2006); Ariz. Rev. Stat. Ann. §§ 13-3821 to 13-3825 (2001 and Supp. 2007); Ark. Code Ann. §§12-12-901 to 12-12-909 (2003 and Supp. 2007); Cal. Penal Code Ann. §§290 to 290.4 (2008); Colo. Rev. Stat. Ann. §§16-22-103 to 16-22-104, 18-3-412.5 (2007); Conn. Gen. Stat. §§ 54-251 to 54-254 (2008 Supp.); Del. Code Ann., Tit. 11, § 4120 (2007); Fla. Stat. Ann. §§ 775.13, 775.21 (2007); Ga. Code Ann. § 42-1-12 (Supp. 2007); Haw. Rev. Stat. §§ 846E-1, 846E-2 (2006 Cum. Supp.); Idaho Code §§ 18-8304 to 18-8311 (Supp. 2008); Ill. Comp. Stat. Ann., ch. 730, §§ 150/1 to 150/10, 152/ 101 to 152/121 (2006); Ind. Code §§ 11-8-8-1 to 11-8-8-7 (Supp. 2007); Iowa Code Ann. §§ 692A.1 to 692A.16 (2003 and Supp. 2008); Kan. Stat. Ann. §§ 22-4901 to 22-4910 (1995); Ky. Rev. Stat. Ann. §§ 17.500 to 17.540 (Lexis 2003 and Supp. 2007); La. Stat. Ann. §§ 15:540 to 15:549 (2005 and Supp. 2008); Me. Rev. Stat. Ann., Tit. 34-A, §§ 11201 to 11204, 11221 to 11228 (2007 Supp. Pamphlet); Md. Crim. Proc. Code Ann. §§ 11-701 to 11-721 (Lexis 2001 and Supp. 2007); Mass. Gen. Laws Ann., ch. 6, §§ 178D to 178J (West 2006 and Supp. 2008); Mich. Comp. Laws §§ 28.721 to 28.731 (West 2004 and Supp. 2008); Minn. Stat. Ann. § 243.166 (West 2003 and Supp. 2008); Miss. Code Ann. §§ 45-33-21 to 45-33-59 (West 1999 and Supp. 2007); Mo. Rev. Stat. Ann. §§ 589.400 to 589.425 (2003 and Supp. 2008), § 211.45 (2004); Mont. Code Ann. §§ 46-23-501 to 46-23-507 (2007); Neb. Rev. Stat. §§ 29-4001 to 29-4013 (2003 and Supp. 2007); Nev. Rev. Stat. §§ 179B.010 to 179B.250 (2007); N. H. Rev. Stat. Ann. §§ 651-B:1 to 651-B:7 (2007 and Supp. 2007); N. J. Stat. Ann. §§ 2C:7-1 to 2C:7-20 (West 2005 and Supp. 2008); N. M. Stat. Ann. §§ 29-11A-1 to 29-11A-8 (2004 and Supp. 2008); N. Y. Corree. Law Ann., Art. 6-C, §§ 168 to 168-V (West 2003 and Supp. 2008); N. C. Gen. Stat. Ann. §§ 14-208.5 to 14-208.26 (Lexis 2007); N. D. Cent. Code Ann. § 12.1-32-15 (Lexis 1997 and Supp. 2007); Ohio Rev. Code Ann. §§ 2950.01 to 2950.11 (West 2006 and Supp. 2008); Okla. Stat., Tit. 57, §§ 581 to 585 (West 2001), Tit. 57, §§ 591 to 594 (West 2007 Supp.); Ore. Rev. Stat. §§ 181.585 to 181.606, 181.826 (2007); 42 Pa. Cons. Stat. §§ 9791 to 9799.9 (2006); R. I. Gen. Laws §§ 11-37.1-1 to 11-37.1-12 (2002 and Supp. 2007); S. C. Code Ann. §§ 23-3-430 to 23-3-490 (2007 and Supp. 2007); S. D. Codified Laws §§ 22-24B-1 to 22-24B-15 (2006 and Supp. 2008); Tenn. Code Ann. §§ 40-39-201 to 40-39-212 (2006 and Supp. 2007); Tex. Code Crim. Proc. Ann., Arts. 62.001 to 62.002, 62.051 to 62.059 (Vernon 2006 and Supp. 2008); Utah Code Ann. § 77-27- *457 21.5 (2003 and 2008 Supp.); Vt. Stat. Ann., Tit. 13, §§ 5401 to 5414 (1998 and Supp. 2007); Va. Code Ann. §§ 9.1-900 to 9.1-921 (2006 and Supp. 2007); Wash. Rev. Code §§ 4.24.550, 9A.44.130, 9A.44.140, 10.01.200, 70.48.470, 72.09.330 (2006); W. Va. Code Ann. §§ 15-12-1 to 15-12-10 (Lexis 2004 and Supp. 2007); Wis. Stat. §§ 301.45 to 301.48 (2005 and Supp. 2007); Wyo. Stat. Ann. §§ 7-19-301 to 7-19-307 (2005).

 Those States are Arizona, California, Connecticut, the District of Columbia, Florida, Illinois, Iowa, Kansas, Kentucky, Massachusetts, Minnesota, Missouri, Nebraska, New Jersey, North Dakota, Oregon, Pennsylvania, South Carolina, Texas, Virginia, Washington, and Wisconsin. See Ariz. Rev. Stat. Ann. §§ 36-3701 to 36-3717 (West 2003 and Supp. 2007); Cal. Welf. & Inst. Code Ann. §§ 6600 to 6609.3 (West 1998 and Supp. 2008); Conn. Gen. Stat. § 17a-566 (2006); D. C. Code §§ 22-3803 to 22-3811 (2001); Fla. Stat. Ann. §§ 394.910 to 394.932 (West 2006 and Supp. 2008); Ill. Comp. Stat., ch. 725, §§ 207/1 to 207/99 (2006); Iowa Code Ann. §§ 229A.1 to 229A. 16 (West 2006 and Supp. 2008); Kan. Stat. Ann. §§ 59-29a01 to 59-29a21 (2005 and 2007 Cum. Supp.); Ky. Rev. Stat. Ann. § 202A.051 (West 2006); Mass. Ann. Laws, ch. 123A et seq. (2003 and Supp. 2008); Minn. Stat. Ann. §§ 253B.01 to 253B.23 (2003 and Supp. 2007); Mo. Ann. Stat. §§ 632.480 to 632.513 (West 2006 and Supp. 2008); Neb. Rev. Stat. Ann. §§ 83-174 to 83-174.05 (Lexis 2007); N. J. Stat. Ann. §§ 30:4-27.24 to 30:4-27.38 (West 2008); N. D. Cent. Code Ann. §§ 25-03.3-01 to 25-03.3-23 (Lexis 2002 and Supp. 2007); Ore. Rev. Stat. §§ 426.005 to 426.070, 426.510 to 426.680 (2007); Pa. Stat. Ann., Tit. 42, §§ 9791 to 9799.9 (Purdon 2007 and Supp. 2008); S. C. Code Ann. §§ 44-48-10 to 44-48-170 (2002 and Supp. 2007); Tex. Health & Safety Code Ann. §§ 841.001 to 841.150 (West 2003 and Supp. 2007); Va. Code Ann. §§ 37.2-900 to 37.2-920 (Lexis 2005 and Supp. 2007); Wash. Rev. Code Ann. §§ 71.09.010 to 71.09.902 (West 2002 and Supp. 2008); Wis. Stat. Ann. §§ 980.01 to 980.14 (West 2007).

 See Ala. Code § 15-20-26 (Supp. 2007) (restricts sex offenders from residing or accepting employment within 2,000 feet of school or childcare facility); Ark. Code Ann. § 5-14-128 (Supp. 2007) (unlawful for level three or four sex offenders to reside within one-half mile of school or daycare center); Cal. Penal Code Ann. § 3003 (West Supp. 2008) (parolees may not live within 35 miles of victim or witnesses, and certain sex offenders on parole may not live within one-half mile from a primary school); Fla. Stat. Ann. § 947.1405(7)(a)(2) (West Supp. 2008) (released sex offender with vie *458 tim under 18 prohibited from living within 1,000 feet of a school, daycare center, park, playground, or other place where children regularly congregate); Ga. Code Ann. §§ 42-1-13, 42-1-15 (Supp. 2007) (sex offenders required to register shall not reside within 1,000 feet of any childcare facility, school, or area where minors congregate); Ill. Comp. Stat., ch. 720, § 5/ 11-9.3(b-5) (West 2006) (child sex offenders prohibited from knowingly residing within 500 feet of schools); Ky. Rev. Stat. Ann. § 17.545 (West Supp. 2007) (registered sex offenders on supervised release shall not reside within 1,000 feet of school or childcare facility); La. Stat. Ann. § 14:91.1 (West Supp. 2008) (sexually violent predators shall not reside within 1,000 feet of schools unless permission is given by school superintendent); Ohio Rev. Code Ann. § 2950.034 (Lexis Supp. 2008) (sex offenders prohibited from residing within 1,000 feet of school); Okla. Stat., Tit. 57, § 590 (West Supp. 2008) (prohibits sex offenders from residing within 2,000 feet of schools or educational institutions); Ore. Rev. Stat. § 144.642 (2007) (incorporates general prohibition on supervised sex offenders living near places where children reside); Tenn. Code Ann. § 40-39-111 (2006) (repealed by Acts 2004, ch. 921, § 4, effective Aug. 1, 2004) (sex offenders prohibited from establishing residence within 1,000 feet of school, childcare facility, or victim).

 Moreover, as noted in the petition for rehearing, the Uniform Code of Military Justice permits such a sentence. See 10 U. S. C. § 856 (2000 ed.); Manual for Courts-Martial, United States, Part II, Ch. X, Rule 1004(c)(9), p. II-131 (2008); id., Part IV, Art. 120, ¶ 45.f(1), p. IV-78.

 Department of Justice, Bureau of Justice Statistics, online at http:// www.ojp.usdoj.gov/bjs/glance/tables/exetab.htm; see also Death Penalty Information Center, Executions in the U. S. 1608-2002: The ESPY File Executions by Date (2007), online at http://www.deathpenaltyinfo.org/ ESPYyear.pdf.

 Of course, the other five capital child-rape statutes are too recent for any individual to have been sentenced to death under them.

 Gregg v. Georgia, 428 U. S. 153; Proffitt v. Florida, 428 U. S. 242; Jurek v. Texas, 428 U. S. 262; Woodson v. North Carolina, 428 U. S. 280; Roberts v. Louisiana, 428 U. S. 325.